IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| EZEKIEL "ZEKE" DAVIS and wife, § <br> MEGAN DAVIS § <br>    *Plaintiffs* § <br> § <br> v. § <br> § <br> KAESER COMPRESSORS, INC., § <br> and PLUMETTAZ AMERICA, CORP. § <br>    *Defendants* § | CAUSE NO:_____ <br> **Jury Trial** |

## PLAINTIFFS' ORIGINAL COMPLAINT

**TO THE HONORABLE COURT:**

**COMES NOW** Plaintiffs EZEKIEL "ZEKE" DAVIS and wife, MEGAN DAVIS, and file this their Original Complaint, complaining of and against KAESER COMPRESSORS, INC., and PLUMETTAZ AMERICA, CORP., and in support thereof respectfully show the Court as follows:

### A.  PARTIES

1. Plaintiff EZEKIEL "ZEKE" DAVIS is a citizen of the State of Texas, and is an individual who resides in Upshur County, Texas. The last three digits of Plaintiff's social security number are 970. The last three digits of Plaintiff's Texas Driver's License are 756.

2. Plaintiff MEGAN DAVIS is a citizen of the State of Texas, and is an individual who resides in Upshur County, Texas. The last three digits of Plaintiff's social security number are 092. The last three digits of Plaintiff's Texas Driver's License are 618.

3. Defendant KAESER COMPRESSORS, INC., (hereinafter "KAESER") is a Foreign For-Profit Corporation. Its principle place of business is located at 511 Sigma Drive, Fredericksburg, VA  22408.  It is incorporated under the laws of the State of Virginia and licensed

to do business in Texas. It may be served with process by serving its registered agent for service, Registered Agent Solutions, Inc., 1701 Directors Blvd, Suite 300, Austin, TX 78744.

4. Defendant PLUMETTAZ AMERICA, CORP., (hereinafter "PLUMETT") is a Domestic For-Profit Corporation. Its principle place of business is located at 225 Thrasher Pike, Soddy Daisy, TN 37421, and is incorporated under the laws of the State of Tennessee. It may be served with process by serving its registered agent for service, Mark A. Smith, 736 Georgia Avenue, Suite 300, Chattanooga, TN 37402-2059.

### B.   JURISDICTION AND VENUE

5. This Court has personal jurisdiction over Defendant KAESER COMPRESSORS, INC., because KAESER is licensed to do business in Texas, was conducting business in Texas at the time this cause of action accrued, and Plaintiffs' claims arise out of said contacts.

6. This Court has personal jurisdiction over Defendant PLUMETTAZ AMERICA, CORP., because PLUMETT was conducting business in Texas at the time this cause of action accrued, and Plaintiffs' claims arise out of said contacts.

7. This Court has subject-matter jurisdiction over this lawsuit under 28 U.S.C § 1332 because there is complete diversity of citizenship between the Plaintiffs and all Defendants, and the amount in controversy exceeds $75,000.00.

8. Venue is proper in the Eastern District of Texas under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred within that district.

### C.   AGENCY/RESPONDEAT SUPERIOR

9. Whenever it is alleged in this Complaint that the Defendants did any act or thing, it is meant that the Defendants' agents, servants, employees, parent agents, ostensible agents, agents by estoppel and/or representatives did such act or thing, and at the time such act or thing was done

it was done with the authorization of the Defendants or was done in the normal routine course of the agency or employment of the Defendant.

### D. FACTS

10. On or about May 5, 2021, Plaintiff's employer, J & S DIRECTION BORING INC., purchased an M125 Kaeser Compressor, identified by VIN WKA0F2203M7907142, for use in the daily operation of its directional boring and/or drilling business. The compressor was manufactured by Defendant KAESER and marketed by Defendant PLUMETT.

11. Following the purchase of the compressor, J & S employees were trained on the proper use of the new equipment.

12. On November 2, 2021, Plaintiff Zeke Davis and two other J & S employees were using a Cable Jet device to force fibre-optic telecommunications cables through pre-installed ducts outside of a gas station and convenience store in Gilmer, Texas, on a contract J & S had negotiated with a local cable company.

13. Plaintiff Zeke Davis and the other employees set the compressor to create approximately 190 psi of pressure, which was the amount of force needed to blow cable through the ducts. However, the compressor at issue was capable of putting out 250 psi of pressure.

14. After insuring that everything was tied down, properly secured, and that all safety features were in place, the employees began the cable-blowing process. Plaintiff, Zeke Davis, was standing over the top of machine to operate the compressor when, suddenly and without warning, the hose through which the cables were pumped blew out of the compressor, striking Plaintiff in the head.

15. Plaintiffs allege the hose's disconnect was caused by a faulty quick connect coupling and a faulty securing mechanism that malfunctioned, causing the whip check safety cable

to not hold the hose properly as it should have. Additionally, Plaintiffs allege that the compressor did not have an automatic shutoff mechanism to regulate the buildup of pressure.

### E.  NEGLIGENCE AS TO KAESER COMPRESSORS, INC.

18. Defendant KAESER is currently and was, at the time compressor was placed in the course of commerce, in the business of selling or otherwise placing in the course of commerce, products similar to the compressor used by J & S, by and through transactions that are essentially commercial in character. The compressor in question was sold or otherwise placed in the stream of commerce by Defendant KAESER. In all aspects material to this case, the compressor was in the same condition at the time of the occurrence in question, as it was when it was originally placed in the stream of commerce by Defendant KAESER.

19. There was a defect in the design of the compressor, at the time it left the possession of Defendant KAESER that was a producing cause of the occurrence in question. Specifically, the compressor continued to increase pressure after reaching the pressure level set by the J & S employees. The design defect rendered the compressor unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use. A safer alternative design existed that would have prevented or significantly reduced the risk of the occurrence in question without substantially impairing the product's utility and was economically and technologically feasible at the time the product left the control of Defendant KAESER by the application of existing or reasonably achievable scientific knowledge. Specifically, the compressor could have included an automatic shutoff once the desired pressure has been reached, which is a common feature on other air compressors.

20. There was a manufacturing defect in the compressor at the time it left the possession of Defendant KAESER that was a producing cause of the injuries and damages to Plaintiffs.

Specifically, any automatic shutoff mechanism was faulty and did not engage. Plaintiffs further allege that the compressor in question was defective and unsafe for its intended purpose at the time it left the control of Defendant KAESER and at the time it was sold.

21.     There was a defect in the marketing of the compressor at the time it left the possession of Defendant KAESER that was a producing cause of the occurrence in question. Defendant KAESER failed to give adequate warnings of the product's dangers that were known or by the application of reasonably developed human skill and foresight should have been known and/or failed to give adequate instructions and warnings to avoid such dangers, which failure rendered the product unreasonably dangerous as marketed. Specifically, Defendant KAESER failed to adequately warn that the compressor at issue had the potential to overload pressure and uncouple certain hose closure mechanisms which were not manufactured to withstand the pressure created by KAESER's machine.

22.     Defendant KAESER failed to exercise ordinary care in the design, manufacturing and/or marketing of the compressor, that is, Defendant KAESER failed to do that which a designer, manufacturer and/or marketer of ordinary prudence would have done under the same or similar circumstances in the design, manufacturing and/or marketing of the product or did that which a designer, manufacturer and/or marketer of ordinary prudence would not have done under the same or similar circumstances in the design, manufacturing and/or marketing of the compressor. Defendant KAESER should have ensured that the compressor was safe for commercial use by including an automatic shutoff mechanism, ensuring that the mechanism functioned properly, and warning that the compressor required stronger than usual hose couplings.

23.     Each and all of the foregoing acts and omissions, singularly or in combination, were a producing and/or proximate cause of the occurrence in question and damages set forth below.

Additionally, Plaintiffs allege that Defendant KAESER is strictly liable for the design defects, manufacturing defects, and failures to warn as alleged above, and invokes the Doctrine of Strict Liability in RESTATEMENT (SECOND) OF TORTS, § 402A, as adopted by the Supreme Court of Texas. Plaintiffs reserve the right to plead more specifically as facts become more fully known in discovery.

### F.     NEGLIGENCE AS TO PLUMETTAZ AMERICA, CORP.

24.     Defendant PLUMETT is currently and was, at the time compressor was placed in the course of commerce, in the business of selling or otherwise placing in the course of commerce, products similar to the compressor in question by transactions that are essentially commercial in character.  The compressor in question was sold or otherwise placed in the stream of commerce by Defendant PLUMETT.  In all aspects material to this case, the compressor was in the same condition at the time of the occurrence in question, as it was when it was originally placed in the stream of commerce by Defendant PLUMETT.

25.     There was a defect in the design of the compressor at the time it left the possession of Defendant PLUMETT that was a producing cause of the occurrence in question. Specifically, the compressor continued to increase pressure after reaching the pressure level set by the J & S employees. The design defect rendered the compressor unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use. A safer alternative design existed that would have prevented or significantly reduced the risk of the occurrence in question without substantially impairing the product's utility and was economically and technologically feasible at the time the product left the control of Defendant PLUMETT by the application of existing or reasonably achievable scientific knowledge. Specifically, the

compressor could have included an automatic shutoff once the desired pressure has been reached, which is a common feature on smaller consumer compressors.

26.     There was a manufacturing defect in the compressor at the time it left the possession of Defendant PLUMETT that was a producing cause of the injuries and damages to Plaintiffs. Specifically, any automatic shutoff mechanism was faulty and did not engage. Plaintiffs further allege that the compressor in question was defective and unsafe for its intended purpose at the time it left the control of Defendant PLUMETT and at the time it was sold.

27.     There was a defect in the marketing of the compressor at the time it left the possession of Defendant PLUMETT that was a producing cause of the occurrence in question. Defendant PLUMETT failed to give adequate warnings of the product's dangers that were known or by the application of reasonably developed human skill and foresight should have been known and/or failed to give adequate instructions and warnings to avoid such dangers, which failure rendered the product unreasonably dangerous as marketed. Specifically, Defendant PLUMETT failed to adequately warn that the compressor at issue had the potential to overload pressure and uncouple certain hose closure mechanisms which were not manufactured to withstand the pressure created by PLUMETT's machine.

28.     Defendant PLUMETT is currently and was, at the time compressor was placed in the course of commerce, in the business of selling or otherwise placing in the course of commerce, products similar to the compressor in question by transactions that are essentially commercial in character.  The compressor in question was sold or otherwise placed in the stream of commerce by Defendant PLUMETT.  In all aspects material to this case, the compressor was in the same condition at the time of the occurrence in question, as it was when it was originally placed in the stream of commerce by Defendant PLUMETT.

29. There was also a defect in the design of the hose coupling mechanism, at the time it left the possession of Defendant PLUMETT that was a producing cause of the occurrence in question. Specifically, the coupling was designed to be opened with very little effort. To prevent the coupling from opening while the compressor was in use, two metal safety pins held the mechanism in place. However, neither the coupling nor the pins were able to withstand the pressure produced by the compressor. At the time of the incident, the pins were straightened out by the pressure of the machine and came loose from the coupling. The coupling, broke free as it was designed to do and caused the hose to hit Zeke Davis in the head. The design defect rendered the coupling mechanism unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use. A safer alternative design existed that would have prevented or significantly reduced the risk of the occurrence in question without substantially impairing the product's utility and was economically and technologically feasible at the time the product left the control of Defendant PLUMETT by the application of existing or reasonably achievable scientific knowledge. Specifically, the coupling could have been designed to be self-securing or the safety pins could have been designed to withstand greater pressure.

30. There was a manufacturing defect in the coupling mechanism at the time it left the possession of Defendant PLUMETT that was a producing cause of the injuries and damages to Plaintiffs. Specifically, the pins included with the coupling mechanism in question were not strong enough to withstand the pressure put out by the compressor. Plaintiffs further allege that the coupling mechanism in question was defective and unsafe for its intended purpose at the time it left the control of Defendant PLUMETT and at the time it was sold.

31. There was a defect in the marketing of the hose and coupling mechanism at the time it left the possession of Defendant PLUMETT that was a producing cause of the occurrence in

question.  Defendant PLUMETT failed to give adequate warnings of the product's dangers that were known or by the application of reasonably developed human skill and foresight should have been known and/or failed to give adequate instructions and warnings to avoid such dangers, which failure rendered the product unreasonably dangerous as marketed. Specifically, Defendant PLUMETT failed to adequately warn that the hose in question was not rated to withstand the pressure put out by the compressor machine.

32. There was also a defect in the design of the whip check safety cable, at the time it left the possession of Defendant PLUMETT that was a producing cause of the occurrence in question. Specifically, the cable was long enough to cause the hose which it secured to extend to the compressor operator's head. The design defect rendered the whip check safety cable unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use. A safer alternative design existed that would have prevented or significantly reduced the risk of the occurrence in question without substantially impairing the product's utility and was economically and technologically feasible at the time the product left the control of Defendant PLUMETT by the application of existing or reasonably achievable scientific knowledge. Specifically, the cable could have been shorter, thereby lessening the reach of the hose should it come undone from the compressor.

33. There was a defect in the marketing of the whip check safety cable at the time it left the possession of Defendant PLUMETT that was a producing cause of the occurrence in question.  Defendant PLUMETT failed to give adequate warnings of the product's dangers that were known or by the application of reasonably developed human skill and foresight should have been known and/or failed to give adequate instructions and warnings to avoid such dangers, which failure rendered the product unreasonably dangerous as marketed. Specifically, Defendant

PLUMETT failed to adequately warn that the cable was long enough to reach a compressor operator's head, should the hose come loose from the compressor. Defendant PLUMETT should have provided a shorter cable to be used when the compressor operator was standing close by.

34. Defendant PLUMETT failed to exercise ordinary care in the design, manufacturing and/or marketing of the compressor, coupling mechanism, and whip check safety cable, that is, Defendant PLUMETT failed to do that which a designer, manufacturer and/or marketer of ordinary prudence would have done under the same or similar circumstances in the design, manufacturing and/or marketing of the product or did that which a designer, manufacturer and/or marketer of ordinary prudence would not have done under the same or similar circumstances in the design, manufacturing and/or marketing of the compressor.

35. Each and all of the foregoing acts and omissions, singularly or in combination, were a producing and/or proximate cause of the occurrence in question and damages set forth below. Additionally, Plaintiffs allege that Defendant PLUMETT is strictly liable for the design defects, manufacturing defects, and failures to warn as alleged above, and invokes the Doctrine of Strict Liability in RESTATEMENT (SECOND) OF TORTS, § 402A, as adopted by the Supreme Court of Texas. Plaintiffs reserve the right to plead more specifically as facts become more fully known in discovery.

### G. DAMAGES

36. Plaintiff ZEKE DAVIS alleges that as a direct and proximate result of the negligent conduct of Defendants, he sustained serious and permanent bodily injuries, including but not limited to a traumatic brain injury. As a result of these injuries, Plaintiff ZEKE DAVIS, has suffered the following damages, amounting to more than $75,000.00:

      a.    Physical pain and mental anguish in the past and future;

      b.    Lost wages and loss of earning capacity in the past and future;

      c.    Physical and mental impairment in the past and future; and

      d.    Medical expenses in the past and future.

37.    Plaintiff ZEKE DAVIS sues for damages to fairly, reasonably, and adequately compensate him for said injuries and losses, all in an amount in excess of the minimum jurisdictional limits of this Court.

38.    Plaintiff MEGAN DAVIS is the wife of ZEKE DAVIS.  Prior to the incident made the basis of this suit, Plaintiffs enjoyed a loving relationship, sharing the mutual affection, solace, comfort, companionship, society, assistance, sexual relations, emotional support, and felicity of a successful marriage.  As a proximate cause of Defendants' negligence and resulting injuries to ZEKE DAVIS, that relationship has been damaged and MEGAN DAVIS has sustained a loss of consortium and in reasonable probability will suffer such in the foreseeable future.

39.    Plaintiffs seek pre-judgment and post-judgment interest at the maximum amount for the maximum period allowed by law.

### J.   GROSS NEGLIGENCE

40.    Defendants' negligence, as alleged herein, is of such character as to make said Defendants liable for gross negligence. The conduct of said Defendants were in heedless and reckless disregard of the rights of Plaintiffs, and involved such an entire want of care as to indicate that it was a result of conscious indifference to the rights, welfare and safety of Plaintiffs. Moreover, such conduct, when viewed objectively from said Defendants' standpoint at the time of the occurrence, involved an extreme degree of risk, considering the probability and magnitude of

the potential harm to others. Plaintiffs seek exemplary damages in such an amount as may be found to be proper under the facts and circumstances.

### L. PRAYER

**PREMISES CONSIDERED,** Plaintiffs pray that Defendants be cited to appear and answer and that upon final trial of this cause Plaintiffs recover as follows:

a. Judgment against Defendants for Plaintiffs' actual damages as set forth above, in an amount in excess of the minimum jurisdictional limits of this Court;

b. Exemplary damages;

c. Pre-judgment and post-judgment interest at the maximum rate allowed by law;

d. Costs of Court; and

e. All other and further relief to which Plaintiffs may be entitled.

**PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY**

Respectfully submitted,

SLOAN, HATCHER, PERRY, RUNGE,
   ROBERTSON & SMITH

/s/ John Sloan
JOHN SLOAN
State Bar No. 18505100
jsloan@sloanfirm.com
EMMA RODDY
State Bar No. 24117358
eroddy@sloanfirm.com
101 East Whaley Street
Post Office Drawer 2909
Longview, Texas 75606
Telephone: (903) 757-7000
Facsimile: (903) 757-7574

ATTORNEYS FOR PLAINTIFFS